# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAN MADISON, an individual domiciled at:<br><br>    5314 Broad Branch Road NW<br>    Washington, DC  20015,<br><br>and<br><br>ALAN MADISON, LLC, d/b/a MADISON & COMPANY, a District of Columbia limited liability company with a principal place of business at:<br><br><br>    5314 Broad Branch Road NW<br>    Washington, DC  20015,<br><br>          Plaintiffs,<br><br>   v.<br><br>THOMAS LANKFORD<br><br>and<br><br>LANKFORD & REED, PLLC,<br><br>          Defendants. | Case No. 1:18-cv-1282<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Alan Madison and Alan Madison LLC allege as follows:

## INTRODUCTION & NATURE OF ACTION

1.      In 1979, fifty-two Americans were taken hostage from the U.S. embassy in Tehran, Iran. They were held captive for over a year, and not released until the United States negotiated an agreement with Iran. As part of securing their release, the United States agreed that the hostages would be barred from

suing Iran for compensation for their ordeal. After they were released, the hostages tried several times—and failed several times—to seek redress in court.

2.      After the courts dismissed a lawsuit brought on the hostages' behalf by attorney Tom Lankford, Lankford sought to persuade Congress to enact legislation that would compensate his clients. Lankford, a litigator, lacked the media, public-relations, lobbying, or drafting experience necessary to achieve his legislative goals. So he assembled a team of professionals who could do the work necessary to get the legislation enacted.

3.      Among others, Lankford recruited Plaintiff Al Madison. Through his single-member LLC, Alan Madison LLC, he oversaw a successful media and public-relations campaign that built public and political support for compensating the former hostages. For nearly half a decade, Madison devoted most of his time to Lankford's team. He also recruited William Oldaker, a veteran lobbyist who worked with members of Congress to get the necessary legislation enacted.

4.      The legislation ultimately provided $270 million in compensation to Lankford's clients. It resulted primarily from Madison's communication strategy and Oldaker's legislative strategy. And although the full $270 million would be distributed over time, Lankford and his team were entitled to 25 percent of that amount—nearly $70 million in fees.

5.      To induce Madison to join the team, Lankford had promised Madison that everyone on the team would receive a "fair" percentage of the fee based on results they achieved. Madison believed—and told Lankford several times—that a

successful media campaign would be worth approximately 20% of the overall fee. Based on what was ultimately secured, Madison's media campaign was worth at least $13.5 million.

6.     Lankford, by contrast, did little (other than bringing in clients and coordinating the team) to earn a share of the fee. And his chosen lobbyists, from Cornerstone Governmental Affairs, largely failed. If the fee is to be distributed in accordance to the relative contributions of the team members, the lion's share ought to go to Madison and Oldaker, who are most responsible for the effort's success.

7.     But as soon as Lankford had the first tranche of money in his hands, he reneged on his promises—claiming that Madison deserved less than three-fourths of a percent, or just $500,000. Lankford likewise tried to get other contributors, including Oldaker, to accept far less than he had promised when recruiting them to his team.

8.     Because Lankford's conduct has deprived Madison of the fair compensation promised for his professional services, Madison now seeks compensatory damages for the amounts that he is owed.

## PARTIES

9.     Plaintiff Alan Madison is a citizen of the United States domiciled in the District of Columbia. Madison is self-employed and performs his work through a single-member limited liability company, Plaintiff Alan Madison LLC.

10.     Plaintiff Alan Madison LLC is a District of Columbia limited liability company doing business as "Madison & Company," with its principal place of

business in the District of Columbia. Throughout this Complaint, we refer collectively to Madison and his work through Madison & Company as "Madison."

11.     Defendant Thomas Lankford is a citizen of the United States domiciled in the Commonwealth of Virginia. Lankford has been a member of the District of Columbia Bar since 1979. At all relevant times, and on information and belief, Lankford was a partner and managing member of Defendant Lankford & Reed, PLLC, and provided all of his legal services through that firm. Each action that Lankford took, as described in this Complaint, was taken within the scope of his role within, and on behalf of, Defendant Lankford & Reed.

12.     Defendant Lankford & Reed, PLLC ("Lankford & Reed") is a Virginia limited liability company, with its principal place of business in Virginia. On information and belief, Defendant Lankford provides all of his legal services through Lankford & Reed.

## JURISDICTION AND VENUE

13.     This Court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of the District of Columbia, and Defendants are citizens of the Commonwealth of Virginia. The amount in controversy exceeds the $75,000 jurisdictional minimum.

14.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

# BACKGROUND

**A.    Fifty-two Americans, who were taken hostage in Iran, try and fail to get compensated in court.**

15.    On November 4, 1979, fifty-two United States nationals were taken hostage in Tehran, Iran. They were held for 444 days, and not released until after the U.S. negotiated the Algiers Accords with the Islamic Republic of Iran.

16.    Under the Algiers Accords, the United States agreed to "bar and preclude the prosecution against Iran of any pending or future claim of . . . a United States national arising out of the events . . . related to (A) the seizure of the 52 United States nationals on November 4, 1979, [and] (B) their subsequent detention."

17.    Despite this agreement, since 1983 the former hostages (and their families) have attempted to sue Iran for compensation. *See, e.g., Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582 (9th Cir. 1983); *Ledgerwood v. State of Iran*, 617 F. Supp. 311 (D.D.C. 1985); *Roeder v. Islamic Republic of Iran*, Case No. 1:00-cv-03110 (EGS), 195 F. Supp. 2d 140 (D.D.C. 2002) ("*Roeder I*"). In each case, the court held that the plaintiffs were barred from recovering, either due to the Algiers Accords or the Foreign Sovereign Immunities Act.

18.    In *Roeder I*, a case in which Lankford and a team of other lawyers represented the plaintiffs, the courts held that while Congress could abrogate the Algiers Accords "clearly and unambiguously," Congress had not done so as of 2002. *Roeder I*, 195 F. Supp. 2d at 166, *aff'd* 333 F.3d 228 (D.C. Cir. 2003).

5

19.     After *Roeder I*, several bills were introduced in Congress; if enacted, they would have enabled the hostages to recover damages from Iran. *See generally* Jennifer K. Elsea, Cong. Research Serv., RL31258, *Suits Against Terrorist States by Victims of Terrorism* 31–32 (2008). None of these bills became law.

20.     In January 2008, Congress passed the National Defense Authorization Act of 2008, Pub.L. 110–181, 122 Stat. 3 (2008), which reformulated the terrorism exceptions to sovereign immunity and created certain private rights of action. Lankford and a team of lawyers soon filed a new lawsuit in this Court, invoking the new law and seeking $6.6 billion in compensatory and punitive damages.

21.     Like its predecessors, that lawsuit failed too. The Court held that Congress did not unambiguously create a cause of action, *see Roeder v. Islamic Republic of Iran*, 742 F. Supp. 2d 1, 17–18 (D.D.C. 2010) ("*Roeder II*"); the D.C. Circuit affirmed, *see* 646 F.3d 56 (D.C. Cir. 2011); and the Supreme Court denied *certiorari*, 132 S. Ct. 2680 (2012).

**B.      Lankford, Madison and others persuade Congress to provide nearly $300 million in compensation for the Iran hostages.**

22.     Having failed in court, Lankford and his team realized that the hostages could not and would not get compensated without new legislation. After years of work, the team persuaded Congress to enact the Justice for United States Victims of State Sponsored Terrorism Act, Pub. L. 114-113, div. O, title IV, § 404, 129 Stat. 3007 (Dec. 18, 2015) ("Act").

23.    Under the Act, Lankford's clients collectively would be entitled to approximately $270 million, as soon as there was sufficient money in a fund established to compensate them funded through fines imposed on those supporting terrorism.

24.    The team's campaign depended on Madison's media and public-relations campaign, which built public and political support for compensating the hostages; and the lobbying of William Oldaker, whom Madison recruited to the team, who worked with members of Congress to help draft and enact the law.

**1. Madison's media and PR campaign builds public and political support for compensating the hostages and their families.**

25.    When Madison joined the team in 2011, few members of the government or general public were aware of—much less concerned with—the plight of the former Iranian hostages. More than three decades had passed since they were captured, and memories of that chapter of American history had faded. As a result, Lankford and the team's main lobbying partner, Cornerstone Government Affairs, struggled to persuade members of Congress to support legislation in 2011.

26.    Madison became the team's only expert in media or public relations. His plan included a number of strategies, including placing op-eds in major publications; arranging meetings between former hostages and members of Congress, and getting press coverage of those meetings; drafting letters to key members of Congress, and getting press coverage of those letters; and generating

press coverage of meetings between former hostages and key members of Congress in those members' districts.

27.    Relying on these and other strategies, Madison's work on behalf of the hostages dramatically increased public and legislative interest in their plight.

28.    For example, Madison's efforts led to opinion pieces appearing in influential Washington, DC political sources like Politico, Roll Call, and The Hill.[1] His efforts also led to a number of articles in respected and high-profile publications such as the New York Times, Washington Post, and National Law Journal.[2]

29.    Among other tactics, Madison used the commercial and critical success of the film *Argo* to raise awareness that the hostages had not been compensated. After *Argo* won the Oscar for Best Picture on February 24, 2013, Madison worked with the National Journal's Jill Lawrence to shape the introduction to the story that she was working on. Published a few hours after the Oscar win, the article's headline proclaimed, "'*Argo*' Is Great, but 52 Former American Hostages Are Still

---

[1] *See* Moorehead C. Kennedy, Jr., *Whose Side is the State Department On?*, Politico (Nov. 4, 2011), http://politi.co/2FfOUQQ; Moorehead C. Kennedy, Jr., *Kennedy: To Hold Iran Accountable, Hostages Must be Remembered*, Roll Call (Aug. 3, 2012), http://bit.ly/2I3RxqP; John Limbert, *In an Embassy Under Siege*, Politico (Sept. 14, 2012), http://politi.co/2FoQ4wJ; Moorehead C. Kennedy, Jr., *Kennedy: Benghazi and Cairo Recall Tehran in 1979*, Roll Call (Sept. 21, 2012), http://bit.ly/2I3h1Ve; Tom Lankford, *Lankford: Iran Hostage Bill the Right Legacy for Hero*, Roll Call (Oct. 31, 2012), http://bit.ly/2Fnn20r; Lowell Bruce Laingen, *Open Letter to John Kerry, the New Secretary of State*, The Hill (Feb. 6, 2013), http://bit.ly/2oRoJsV.

[2] *See* Matthew L. Wald, *3 Decades Later, Ex-Hostages Press On for Damages From Iran*, N.Y. Times (Apr. 12, 2012), http://nyti.ms/2I5Z748; Marcia Coyle, *Iran Hostages Take Fight to the High Court*, Nat'l L. J. (Apr. 30, 2012); Paul Bedard, *31 Years Late, Iran Hostages Near Payoff*, Wash. Examiner (May 16, 2012), http://washex.am/2tmoTOs; Matthew L. Wald, *Justices Reject Appeal Seeking Payments for Ex-Iran Hostages*, N.Y. Times (May 29, 2012), http://nyti.ms/2FVA8jv; Matthew L. Wald, *Halting a Slow Fade to History: 'Argo,' as Seen by the Iran Hostage Crisis Survivors*, N.Y. Times (Oct. 16, 2012), http://nyti.ms/2FhUbKV.

Looking for Justice." Jill Lawrence, *'Argo' Is Great, but 52 Former American Hostages Are Still Looking for Justice*, Nat'l L.J. (Feb. 25, 2013), http://bit.ly/2oNqo2s.

30.     That article dramatically increased public awareness that the hostages had still not been compensated. And because key members of Congress had seen *Argo*, Madison's efforts to link the hostages' campaign to *Argo* paid significant dividends.

31.     After the *Argo* announcement, Madison's efforts continued to generate top stories in prominent national news outlets.[3] Madison's public-relations and

---

[3] *See* Matthew L. Wald, *Iran Hostages See Renewed Focus on Their 17-Year Bid for Compensation*, N.Y. Times (May 8, 2013), http://nyti.ms/2thymXo; Jonathan Karl, Richard Coolidge, and Jordyn Phelps, *Iran Hostages Locked in Struggle for Compensation, Tell Their Story of 'Colossal Injustice,'* Yahoo! News (May 15, 2013), http://yhoo.it/10Xok2n; Jason Rezaian, *In Tehran, 'Death to America' Still Rings 34 Years Later*, Wash. Post (Nov. 3, 2013), http://wapo.st/2H04Siv; Tabassum Zakaria, *Former Iran Hostages: Amid Rapprochement They Still Want Apologies*, Reuters (Nov. 24, 2013), http://reut.rs/2tdtLp1; Associated Press, *Former Embassy Hostages Skeptical of Iran Nuclear Deal*, NY Daily News (Nov. 26, 2013), http://nydn.us/2CVSJZG; Louis Charbonneau, *Former U.S. Hostages Angry About New Iran U.N. Envoy Appointee*, Reuters (Mar. 31, 2014), http://reut.rs/2FOX8kb; Kambiz Foroohar & David Lerman, *Hostage-Taking Past of Iran's UN Pick a Dilemma for Obama*, Bloomberg News (Mar. 31, 2014), https://bloom.bg/2I2dV3K; *Former Iran Hostage Demands Compensation From Iranians*, Air Force Times (July 29, 2014); Jill Lawrence, *Sending the Right Messages on Terrorist Acts*, Nat'l Memo (Sept. 4, 2014), http://bit.ly/2GXtEja; Carol Guensburg, *After 35 Years, Ex-Iran Hostages Still Caught in Waiting Game*, Voice of America (Nov. 2, 2014), http://bit.ly/2F94DFn; Mark Landler, *For Former Embassy Hostages, a Special Interest in Iran Talks*, N.Y. Times (Nov. 25, 2014), http://nyti.ms/2FlWrAX; Frances Stead Sellers, *The Tehran Hostages' Endless Siege: A Quest for Compensation and Closure*, Wash. Post (Feb. 2, 2015), http://wapo.st/2FNLJ3S; Frances Stead Sellers, *Remembering Their Fathers: Children of the Tehran Hostages Look Back*, Wash. Post (Feb. 4, 2015), http://wapo.st/2CW1bYV; Cristina Corbin & Perry Chiaramonte, *Ex-Iranian Hostages Agree with Bibi: Tehran Can't Be Trusted*, Fox News (Mar. 3, 2015), http://fxn.ws/2H45P9z; Fred Barnes, *Hostages? What Hostages?*, Weekly Standard (Apr. 20, 2015), http://tws.io/2I3UR5q; Kevin Cirilli, *Victims of Iran Hostage Crisis Demand Compensation In Nuclear Deal*, The Hill (Apr. 9, 2015), http://bit.ly/2CVPdyk; Jonathan Weisman & Jennifer Steinhauer, *Seeking Voice in Iran Deal, Lawmakers Are Set to Act*, N.Y. Times (Apr. 12, 2015), http://nyti.ms/2I10xgz; Kelly Cohen, *Former Iran Hostage: Obama Must Demand Apology, Compensation for Americans Held in 1979*, Wash. Examiner (Jun. 30, 2015), http://washex.am/2tjxrpo; Donovan Slack, *Iran Hostages May Finally Get Compensation for '70s Ordeal*, USA Today (Aug. 26, 2015), https://usat.ly/2CYxqq8; Paul Bedard, *Americans Held Hostage*

media efforts also led to a number of stories and interviews on radio and television.[4]

Madison also drove local stories in the home jurisdictions of key members of

Congress whose support the team was pursuing.[5]

32.    Between October 2011 and the end of 2015, Madison's efforts led to

over 100 stories and op-eds across the country. Of particular note was Madison's

---

*444 Days In Iran Wait Another 12,706 for Justice*, Wash. Examiner (Oct. 26, 2015),
http://washex.am/2CXT5Pp.

[4] *See Ex-Hostages Seek Damages From Iran Decades Later: Former Hostage Rocky Sickmann Speaks Out*, Fox News (Apr. 20, 2012), http://bit.ly/2I6Kv4E; Interviews on Fox News Radio and NBC Nightly News (Feb. 26, 2013); Alex Witt, *Iran Hostages Seek Restitution*, MSNBC News (Mar. 2, 2013), http://nbcnews.to/2D0rAof; *Senator Introduces Legislation to Compensate Hostages Held in Iran*, WSB-TV (Mar. 20, 2013), http://2wsb.tv/2FhgOQE; *Argo-Inspired Bill Aims to Compensate Iranian Hostages*, BBC News (Mar. 29, 2013), http://bbc.in/2oJWPjb; *Former Hostages Wary of Thawing U.S.-Iran Ties*, Reuters Video (Nov. 24, 2013), http://reut.rs/2tcoHkR; *American Held Hostage for 444 Days In Iran Calls Nuke Deal 'Foolishness,'* CBS DC (Nov. 26, 2013), http://cbsloc.al/2oG1XoF; One-hour special on Anderson Cooper about the 35th Anniversary of the fall of the embassy in Tehran (Nov. 2014); *Former Iran Hostage John Limbert Shares Experiences 35 Years Later*, CCTV America (Nov. 25, 2014), http://bit.ly/2FmfA5G; *Iran Hostages Seek 'Compensation and Closure,'* Morning Joe (Feb. 3, 2015), http://on.msnbc.com/2F9Z0H1; *Former Hostage Says We Shouldn't Trust Iran*, Fox News (Mar. 5, 2015), http://bit.ly/2HXvuSJ; Devin Dwyer and Robin Gradison, *Former Iran Hostage: President Obama Must Demand Apology, Compensation for Americans Held in 1979*, ABC News (Jun. 30, 2015), http://abcn.ws/1HrPoAC; and Several other on-air interviews with Fox News (e.g., The Kelly File, Your World with Neil Cavuto), Meet the Press, BBC, CNN, CBS, NPR, Al-Jazeera English, ABC News, and other prominent news outlets

[5] *See* Peter Corbett, *Ex-Iran Hostage Survived on Faith, Power of Prayer*, Republic (Nov. 9, 2012), http://bit.ly/2FmgiA9; Josh Rouse, *Held Hostage: Tortured Through 444 Days of Captivity in Iran, Man Tells of Experience, Issues Warning for U.S.*, Lawton Const., Nov. 13, 2012, at 1A; Daniel Malloy, *Isakson Bill Seeks Money for 1979 Iran Hostages*, Atlanta J. -Const. (Mar. 17, 2012), http://on-ajc.com/2oIGR8O; Mike Bush & KSDK, *Former Hostage Says Nuclear Deal with Iran Is a Mistake*, KSDK St. Louis (Nov. 24, 2013); Steve Tetreault, *Iran Hostage, Family Still Haunted 35 Years Later*, Las Vegas Review-Journal (Nov. 1, 2014); Sean Whaley, *Still Fighting After 25 Years*, Las Vegas Review-Journal (Nov. 4, 2014); Craig Gilbert, *Compensation Finally Near for Hermening, Other Iran Hostages*, Milwaukee-Wisconsin Journal Sentinel (June 13, 2015), available at http://bit.ly/2I32j0D; Sean Duffy, *Iran Hostages Deserve Justice*, Milwaukee-Wisconsin Journal Sentinel (Sept. 11, 2015), http://bit.ly/2CYoL78; Greg Bluestein, *Former Iran Hostages in Georgia Cautiously Optimistic About Nuke Deal*, Atlanta Journal-Constitution (July 14, 2015), http://bit.ly/2I1jlw4.

success with the New York Times, which published eight stories sympathetic to the hostages' cause.

33.    Madison's media campaign was especially important because many other victims of state-sponsored terrorist attacks—including bombings of the Beirut military barracks, Khobar Towers, U.S.S. Cole, and the Nairobi and Dar es Salaam embassies—were competing for media coverage and legislative attention, yet had failed to generate attention comparable to that obtained by Madison's work on behalf of the Iran hostages.

### 2. Madison shapes legislators' messages and coordinates communications to and by former hostages.

34.    In addition to spearheading the media and public-relations efforts, Madison helped the team spread its message in other ways.

35.    For example, Madison drafted talking points that members of Congress used in interviews and speeches. He also persuaded reporters to pose timely questions in White House press briefings to pressure other key officials whose help was needed.

36.    More generally, Madison advised the team on efforts to persuade the legislative and executive branches and the media, and he drafted communications for Lankford to send to the clients and others. And he advised the former hostages and their family members about how to best contact their elected officials and deliver a focused message during interviews.

37.     Madison also introduced the team to those with experience running digital campaigns. Around April 2015, Madison introduced Lankford to Joe Trippi, who had revolutionized the use of social media and online campaigning for Howard Dean's 2004 presidential campaign. Trippi ended up working with Lankford for several months to expand social-media exposure for the former hostages.

### 3. Madison recruits William Oldaker, who converts Madison's media campaign into legislative success.

38.     Despite Madison's success generating political and media support for compensating the hostages, by spring 2014 it had become clear that Cornerstone was unlikely to persuade Congress to enact meaningful legislation. Accordingly, on May 2, 2014, Madison met with William Oldaker for advice on how the team could succeed where Cornerstone had failed.

39.     Oldaker was and is well connected in Washington, DC. From 1968 to 1975, he served as an assistant to the Chairman of the U.S. Equal Employment Opportunity Commission; he later served as General Counsel to the Federal Election Commission from 1976 to 1979. From 1979 to 1980, Oldaker was General Counsel and Treasurer to the Kennedy for President Committee. In 1999, President Clinton appointed Oldaker to serve on the National Bioethics Advisory Commission, on which he sat until 2002.

40.     After the 1980 presidential election, Oldaker entered private practice. There, he represented Senator Joe Biden in his 1988 presidential run and General Wesley Clark in his 2004 presidential run; and served as Ethics and Election Law

Counsel to Senate Majority Leader Harry Reid; Senate Minority Leader Tom Daschle; Senators Ted Kennedy, Tom Harkin, Max Baucus, Edward Markey, and Byron Dorgan; and Representatives Sander Levin and Charlie Rangel. In addition, Oldaker lobbied the legislature on behalf of a broad range of clients.

41.     Madison introduced Oldaker to Lankford, and the trio met in May 2014. During that meeting, Lankford told Oldaker that Cornerstone was making insufficient progress and asked Oldaker if he would help.

42.     On December 30, 2014, Lankford emailed Oldaker to request that the two of them sit down after the holidays to produce a "game plan" to succeed where Cornerstone had failed. In early January 2015, Madison, Lankford, and Oldaker began strategizing in earnest about how Oldaker could get Congress to enact legislation to compensate Lankford's clients. By the end of January 2015, Oldaker joined Lankford's team as a full member.

43.     Among his efforts, Oldaker came up with the idea of introducing legislative language in the year-end omnibus appropriations bill, which would require a supporter of the former hostages and their families to serve as a key negotiator on the omnibus bill.

44.     Around that time, Oldaker learned that Drew Willison—then the Senate Sergeant-at-Arms—was likely to become Chief of Staff to Senate Minority Leader Harry Reid; this position would make Willison one of four negotiators for the 2015 year-end omnibus appropriations. Oldaker, Reid, and Willison had been

friends for decades; Oldaker had even worked as outside counsel for Reid on several cases.

45.    Oldaker sought to convince Reid and Willison to include payments to the former hostages and their families as part of the omnibus appropriations. Oldaker believed that the strategy pursued by Cornerstone—trying to get a separate bill passed to compensate the hostages and their families under regular order—was nearly impossible, and that the omnibus-appropriations approach was more likely to succeed.

**4. Madison facilitates efforts to obtain support from the Obama Administration.**

46.    While Oldaker worked with Congress, Madison built support from the White House. During February and March of 2015, he arranged meetings with David Mortlock, who oversaw Iranian sanctions at the National Security Council. Lankford joined Madison in those meetings, which were held to see if the White House would support compensating the hostages.

47.    In addition, in April 2015 Madison introduced Lankford to former White House Counsel Greg Craig, who lent credibility to the hostages' efforts, particularly with the Obama administration and Senators Reid and Isakson.

48.    Craig initially helped Lankford's team craft an executive order as a possible alternative to legislation. The executive order was never enacted, but the process raised awareness and built support at the White House, including at the Office of Management and Budget, thus helping to facilitate enactment of the Act.

49.     Although these efforts did not lead to an executive order providing compensation, on information and belief it did lead the White House to ultimately support the Act.

### 5. Congress approves legislation to compensate the hostages.

50.     On December 16, 2015, Congress passed the omnibus bill, which included the Justice for United States Victims of State Sponsored Terrorism Act, Pub. L. 114-113, div. O, title IV, § 404, 129 Stat. 3007 (Dec. 18, 2015). The Act established a fund from which the former Iran hostages would be entitled to receive payments of $10,000 per day of captivity and a lump sum of $600,000 for each of their spouses and children.

51.     The bill also ensured that the hostages would be compensated as quickly as possible. While other victims of state-sponsored terrorism would need to obtain specific federal judgments entitling them to compensation, the former Tehran embassy hostages and their family members would need only prove that they were members of proposed class put forth in *Roeder I*.

52.     The Act also provided that money in the fund would be distributed pro rata to all eligible claimants until everyone had received the compensation to which they were entitled.

53.     If paid in full, the total potential award to the Lankford team's clients is approximately $270 million. As a result, the Lankford team is eligible to receive approximately $67.5 million in compensation for its work on behalf of the former Iran hostages.

54.     Even after Congress passed the Act, Madison's media campaign continued, to encourage Congress to appoint a Special Master and begin compensating victims promptly. *See, e.g.*, David M. Herszenhorn, *Americans Held Hostage in Iran Win Compensation 36 Years Later*, N.Y. Times (Dec. 24, 2015), http://nyti.ms/2oHembV (front-page story); *Why It Took 36 Years to Compensate Iran Hostage Victims*, PBS NewsHour (Dec. 24, 2015), http://to.pbs.org/2FnTznd.

**C.   Lankford recruited Madison to the team promising him a percentage share of the recovered fees.**

55.     Lankford told members of his team—including Madison—that they would receive a percentage of the fees received: that is, 25% of the compensation paid to the former hostages under the terms of the Act and the client retainer agreements. When the full compensation is paid, that will amount to approximately $67.5 million in fees, to be shared among the professionals.

**1.     Cornerstone offers Madison $10,000 to help place an op-ed.**

56.     Around spring 2011, when Lankford was waiting for the D.C. Circuit to decide the appeal in *Roeder II*, Cornerstone Government Affairs's Mike Smith and Madison began discussing whether Madison might support Smith's client matters.

57.     Smith explained that one of his clients, retired American diplomat and former Tehran hostage Moorhead Kennedy, had drafted an op-ed about the ordeal. Smith asked Madison to help get the op-ed published in a mainstream publication. Madison agreed to do so for $10,000.

16

58.     Shortly after that meeting, Madison discussed the op-ed over email with Smith, Lankford, and others. After some editing, including by Madison, he approached friends and acquaintances at the New York Times, Washington Post, and Wall Street Journal. Each publication expressed interested in the story, but declined to publish the op-ed.

59.     On October 25, 2011, Madison sent his invoice to Smith for $10,000, which Smith's firm paid. The next day, Madison sent the op-ed to Allison Silver at Politico, who agreed to publish the op-ed. It was published on November 4, 2011.

60.     Madison also told Lankford and Smith that once Politico ran the piece, he would help them "figure [out] next steps" whenever they were ready.

## 2. Madison agrees to do certain additional tasks over the next year for $500,000.

61.     After Madison placed Kennedy's op-ed in Politico, Madison and Lankford began discussing ways that Madison could help Lankford's team more extensively.

62.     Smith explained that everyone on the team was working on contingency, and that Cornerstone could not continue to pay Madison out of its own pocket.

63.     In a series of phone conversations and emails with Smith, Madison said that he was willing to work on contingency if they could "identify a mutually agreeable work plan . . . and a sense of what might be available to [him] on the back end if the forces of good prevail."

17

64.     Initially, on November 17, 2011, Madison suggested that he help them place two op-eds in the local districts of two key members of Congress who might be most helpful to the former hostages' cause. Madison suggested that in exchange, he be paid "$6,000 per local op-ed—for a total of $12,000 payable if and when the broader effort succeeds." Smith and Lankford did not agree at that point.

65.     In late January 2012, Smith told Madison that the team hoped to bring some media attention to their clients' case when the government was expected to file its brief in opposition to the cert petition in *Roeder II*.

66.     After a conference call between Lankford, Madison, and Smith on January 31, 2012, Madison emailed Smith and Lankford with a "moving forward plan" to expand public attention on the plight of the former hostages. That attention would help them persuade Congress to enact legislation compensating them for their suffering.

67.     The next day, Madison emailed Smith to ask whether "we are taking on [Madison's] plan sequentially," noting that "before I begin we should probably have some sort of discussion on what the terms/payoff will be down the road should we be successful."

68.     In response to that email, Smith proposed that Cornerstone—which had been retained by Lankford & Reed—would pay $500,000 for the services described in Madison's "moving forward plan."

69.     Madison agreed to accept $500,000 (contingent on succeeding in getting the former hostages compensated), in exchange for completing the discrete

tasks listed in his "moving forward plan." Madison expected to complete those tasks
within three to six months, and Smith said that he expected the hostages to succeed
in their larger effort within a year.

### 3. Madison and Lankford agree to modify Madison's compensation, to be calculated as a percentage of the overall fees.

70.     Within the first week of beginning the new project in January 2012,
Madison began reporting to and communicating directly with Lankford. Smith and
Cornerstone no longer acted as an intermediary.

71.     It soon became clear that Madison was a full-fledged member of the
team. Rather than acting as a subcontractor to, or under the direction or authority
of Cornerstone, he acted as an independent professional, advising Lankford and his
team directly. Madison's role also expanded; he was implementing far more than
the four specific strategies that Madison had described initially.

72.     Soon, Madison realized, and discussed regularly with Lankford during
their frequent meetings, that Smith and Cornerstone were not as active or
successful in the effort as they had initially led Madison to believe.

73.     Given these changed circumstances, Madison and Lankford discussed
Madison's compensation nearly a dozen times from early 2012 until the end of 2015.

74.     In the first of these meetings, Madison told Lankford that if the
endeavor was to succeed, Madison would have to do far more work than had been
proposed in the "moving forward plan" for which Madison had been promised
$500,000.

75.    To induce Madison to do this added work, Lankford agreed to pay Madison far more. Specifically, Lankford agreed that (a) Madison would receive not a flat fee, but rather a percentage of the gross fee provided to the team; (b) the precise percentage of Madison's compensation would be determined based upon the results of each member's contribution towards the team's overall success, and not based upon the amount of time expended or on other considerations; (c) Madison's percentage of the fee would be "fair"; and (d) Lankford—not Cornerstone—would evaluate the value of Madison's contributions relative to the other team members.

76.    Throughout these discussions, Madison told Lankford that legislative success would require substantial media pressure, and that a successful media campaign would be worth approximately 20% of the overall effort. In response, Lankford assured Madison that he would be compensated fairly and in proportion to his contributions as determined in good faith by Lankford.

77.    In context, Lankford communicated to Madison—and understood that he had communicated to Madison—that he agreed that 20% of the overall fee reflected fair compensation for Madison, but that he wanted to retain reasonable discretion to determine precisely how much each team member had contributed towards the overall success. And Lankford understood that Madison was working for Lankford's team based on this understanding.

78.    Madison also expected that the value of his relative share of the overall fee would reflect his other contributions, including recruiting Oldaker to the team,

20

introducing the team to other people who could cultivate support from the Obama administration, and facilitating client communication and other non-media efforts.

79.     Throughout 2012 and later years, Lankford told Madison that nobody on the team had an agreement, much less a written agreement, for a specific fee or percentage of the fee. Lankford did so to prevent Madison from insisting that Lankford confirm in writing what he had promised orally: a fee-splitting arrangement in which Madison could reasonably expect to receive around 20% of the fee if his efforts succeeded. By doing so, Lankford also signaled to Madison that because the other team members trusted Lankford to fairly distribute a potentially large sum of money, Madison should trust Lankford as well.

80.     In mid-2012, after learning from two friends that the D.C. Rules of Professional Conduct sometimes prohibit lawyers from splitting fees with non-lawyers, Madison asked Lankford whether these rules would affect their agreement. Lankford assured Madison that their arrangement complied with the ethical rules and reiterated that Madison would receive a percentage of the overall fee.

### 4. Lankford has a secret agreement to pay Cornerstone one-third of the fees, and for Cornerstone to pay the other lobbying and media professionals from that fund.

81.     On information and belief, when Lankford conveyed to Madison that he could reasonably expect to receive 20% of the overall fee and that no other party had an agreement for a specific percentage of that fee, Lankford actually did have an agreement with Cornerstone. That agreement provided, on information and belief, that Cornerstone would receive one-third of the gross fee, and that

21

Cornerstone would pay any other "governmental and media folks," including Madison, out of their share.

82.     This secret agreement was confirmed in a September 18, 2015 email between Lankford and Cornerstone's Smith. That email also confirmed that another professional, who played a minor role on the team, had a written agreement to be paid $500,000 out of Cornerstone's share.

83.     While Madison was serving Lankford's team, neither Smith, Lankford, nor anyone else told him that Cornerstone and Lankford had such an agreement.

**5.    Lankford tells Madison and others that he expects to keep 60% of the fee for himself and his firm and will distribute the rest to members of the team.**

84.     Lankford had discussions with other members of the team, including Oldaker, that were similar to his discussions with Madison.

85.     At least three times in 2015, Lankford told Oldaker that no one else had any agreement for a particular percentage of the overall fee, team members would be compensated with a percentage of the fee, and "if you perform, you will be compensated fairly."

86.     On March 23, 2016, shortly after Congress enacted the Act, Oldaker and Lankford met for lunch at a hotel near the White House. Oldaker asked how he would be paid for his work. Lankford responded that he expected to keep approximately 60% of the fees, and that the rest would be split fairly among the team's various lobbying and public-relations professionals, such as Madison, Oldaker, and Cornerstone.

22

87.     Lankford also falsely told Oldaker what Lankford had falsely told
Madison: No team members had any specific agreements on how fees would be
shared.

**D. Lankford reneges on his compensation agreement with Madison and
other team members.**

88.     When the money started coming in, Lankford reneged on his
agreement with Madison and other team members and sought to dramatically and
retroactively reduce their compensation. And although Lankford had repeatedly
told Madison and Oldaker that he expected his firm to retain only 60% of the gross
fees, once the money came he attempted to keep nearly 85% of those fees.

    **1. Lankford attempts to strip Oldaker of virtually all
compensation.**

89.     The first payments for the benefit of the former Iran hostages were
made in February or March 2017.

90.     On March 3, 2017, Lankford emailed Oldaker and claimed that
Oldaker's entire compensation would consist of the referral of certain contingency
cases—cases which Lankford had referred to Oldaker in the past few months, and
which Oldaker and Lankford were pursuing jointly.

91.     Oldaker was shocked. He had understood that he would be paid for the
referred cases based on the services that he provided to those clients, and not for
services that he provided to Lankford on behalf of the Iranian hostages. The
arrangement identified by Lankford, moreover, would violate the D.C. Rules of
Professional Conduct, including Rule 7.1(c).

92.     Before this March 2017 email, Lankford had not once asked Oldaker to waive his right to be paid for his work on behalf of the Iran hostages in exchange for Lankford referring other contingency cases to him. Had Lankford asked Oldaker to do so, Oldaker would have refused.

**2.  Lankford delegates Madison's compensation to another firm, which seeks to dramatically reduce Madison's fee.**

93.     As for the other members of the team, Lankford hired a lawyer, Venable's Ed Wilson, to recommend how much each member should be paid—despite Lankford and Madison's agreement that Lankford would personally calculate each person's compensation in good faith.

94.     On April 18, 2017, Wilson told Madison, through his counsel, that Madison must either accept $500,000 or he would have "no claim as his agreement is with Lankford & Reed ("L&R") and Al agreed that any payment to him from L&R is entirely within L&R's discretion." In other words, Wilson claimed that Lankford & Reed's discretion was absolute, and included the right to decide to pay Madison nothing.

95.     In December 2017, Wilson offered to pay Madison $750,000, which "is the contract amount he had with Cornerstone . . . of $500,000, plus $250,000 to reflect the value of additional work Al performed." The payment would be made by Cornerstone, not Lankford, and paid over time.

96.     Although Madison had devoted most of his time to Lankford's team for nearly half a decade, conceived and implemented a successful media and public-

relations campaign, and recruited the lobbyist who worked with members of Congress to get the Act enacted, Wilson now claimed that Madison had been a "bit player" and proposed to pay him just over 1% of the $67.5 million in fees received by Lankford's team.

## COUNT I: Fraudulent Misrepresentation and Omission
## (Against all Defendants)

97.    Plaintiffs incorporate the allegations set forth in the paragraphs above.

98.    To deceive Madison into continuing to serve him and his clients, Lankford, on behalf of himself and his firm, knowingly made several false representations to Madison. Specifically:

a.  Lankford falsely promised Madison that his compensation would be calculated as a reasonable percentage of the gross legal fees;

b.  Lankford falsely promised Madison that the precise percentage would be determined in good faith;

c.  Lankford falsely promised Madison that his percentage of the gross fee would depend upon the degree to which Madison contributed to the team's success relative to the other members of the team, even though Lankford intended to pay Madison just over $500,000;

d.  Lankford falsely promised Madison that their fee-splitting arrangement complied with the D.C. Rules of Professional Conduct;

e.   Lankford falsely promised Madison that Lankford—not Cornerstone or some other entity—would determine the appropriate percentage to pay Madison; and

f.   Lankford falsely promised Madison that nobody else on the team had an agreement for any specific amount of compensation.

99.   Lankford deceived Madison through silence as well. When Madison told Lankford that he believed that his public-relations effort would be worth approximately 20% of the gross fee, Lankford intended to pay Madison no more than one or two percent of the fee, to be paid out of the one-third share that he had already promised (in writing) to Cornerstone. Yet Lankford remained silent, intentionally leading Madison to believe that twenty percent was the ballpark fee percentage that Madison would be paid.

100.   The misrepresentations and omissions described above were material and made with intent to deceive Madison into continuing to provide the team with valuable services—well beyond the limited services to which Madison and Cornerstone had initially agreed.

101.   As a result of Lankford's deception, Madison reasonably believed that Lankford would pay him at least 20% of the gross fee in exchange for his media and public-relations services, as well as his other efforts, including his outreach to the White House and recruiting Oldaker.

102.   Relying on Lankford's misstatements and omissions, Madison contributed the majority of his working time from approximately 2012 through 2016

to the benefit of Lankford's Iran-hostage clients, going well beyond the limited scope of the initial set of services that he had agreed with Cornerstone to perform for $500,000.

103.   As a result of this action taken in reliance on Lankford's deceptive statements and omissions, Madison suffered substantial damages.

104.   Lankford's actions described above were accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of Madison's rights, and other circumstances tending to aggravate the injury.

## COUNT II: Breach of Fiduciary Duty
### (Against all Defendants)

105.   Plaintiffs incorporate the allegations set forth in the paragraphs above.

106.   By insisting that Madison trust his judgment and integrity in connection with any decision about what percentage of gross fees Madison would be paid, Lankford (on his own behalf and on behalf of his firm) stood in fiduciary relation to Madison with respect to Madison's compensation.

107.   A fiduciary relationship also arose between Lankford and Madison because, well in advance, both parties understood that any fees would be paid to Lankford & Reed, who would then have a duty to disburse those funds in accordance with the parties' agreements.

108.   Lankford fostered Madison's trust, further establishing a fiduciary relationship, by socializing with Madison on a regular basis, attending baseball games, dinners, and lunches, and generally purporting to be Madison's friend; by

invoking his standing in the legal community and ethical obligations as a lawyer; and by misrepresenting to Madison that other members of the team trusted him enough to forgo a written agreement about their precise compensation. *See Cyberex Corp. v. Abbarin*, No. 2014 CA 0060904, 2017 WL 6452616 at *4 (D.C. Super. Ct. Oct. 25, 2017) (fiduciary relationship arose from friendship, prior work relationship, and expertise, especially when that relationship caused plaintiffs to be "disinclined to take precautionary measures that they would have otherwise performed") (citing *Urban Invest., Inc. v. Branham*, 464 A.2d 93, 97 (D.C. 1983); *Hammett v. Ruby Lee Minar, Inc.*, 53 F.2d 144, 147 (D.C. Cir. 1931)).

109.   The agreement between the parties meant that Lankford would in essence be acting as an escrow agent for the funds that would be disbursed to him, and held in trust by him, before being distributed to the other members of the team.

110.   Because Lankford fostered Madison's trust in Lankford's integrity and good faith, Madison failed to take other precautionary measures, such as insisting that Lankford agree in writing to what he had agreed orally: Madison would be entitled to a percentage of the gross fees, and that at least 20% was a reasonable amount to expect if Madison's media and public-relations efforts succeeded.

111.   Because of the fiduciary relationship between Lankford and Madison, Lankford owed Madison a duty to refrain from seeking, secretly or otherwise, to personally profit at Madison's expense.

112.    Nevertheless, when it was time to pay Madison, Lankford asked Wilson to play hardball, and authorized Wilson to claim that Madison was legally entitled to receive only $500,000.

113.    Knowing all along that Madison expected to receive at least 20% of the fees if the team obtained compensation for the Iran hostages, and that Madison's expectation was based upon the trust in Lankford's good faith and integrity that Lankford intentionally fostered, Lankford had a heightened duty to refrain from undermining Madison's expectations to Lankford's own personal benefit.

114.    By offering to pay Madison anything less than 20% of the gross fee, Lankford breached his fiduciary duty to Madison.

115.    Lankford's actions were accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of Madison's rights, and other circumstances tending to aggravate the injury.

## COUNT III: Breach of Implied-in-Fact Contract (in the alternative) (Against all Defendants)

116.    Plaintiffs incorporate the allegations set forth in the paragraphs above.

117.    Madison and Lankford, on his own behalf and on behalf of his firm, understood from their words and conduct that they had a binding agreement with the following terms: (a) Madison would expand the scope of his work for Lankford's team; (b) Madison would receive a percentage of the gross fee provided to the team, not a flat sum; (c) the precise percentage of Madison's compensation would be

determined based upon the results of each team member's contribution towards the overall success, and not based upon the amount of time expended or other considerations; (d) Madison's percentage of the fee would be "fair," with the understanding that 20% of the gross fee would be fair compensation for a successful media and public-relations campaign leading to a successful legislative outcome; and (e) Lankford—not Cornerstone or someone else—would evaluate the value of Madison's relative contributions and set the appropriate percentage.

118.    Lankford breached that agreement by offering to pay Madison barely more than 1% of the overall fee and threatening to pay him even less if he did not agree to that amount.

119.    As a result of Lankford's breach, Madison suffered damages in the amount of compensation he was owed under the terms of their contract.

120.    Lankford's breach of his agreement with Madison is such that his conduct merges with, and assumes the character, of a willful tort, one that is calculated rather than inadvertent. Lankford's actions are malicious, wanton, oppressive, and with indifference to his civil obligations to Madison.

## COUNT IV: Quantum Meruit (in the alternative)
## (Against all Defendants)

121.    Plaintiffs incorporate the allegations set forth in the paragraphs above.

122.    Madison provided valuable services to Defendants.

123.   Defendants accepted and enjoyed the benefits of those services under circumstances that reasonably notified them that Madison expected to be paid for them. But Defendants did not pay Madison the reasonable value of his services.

124.   As a result, Madison suffered damages by not being paid for the reasonable value of his services.

125.   Defendants' actions were accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of Madison's rights, and other circumstances tending to aggravate the injury.

### COUNT V: Unjust Enrichment (in the alternative)
### (Against all Defendants)

126.   Plaintiffs incorporate the allegations set forth in the paragraphs above.

127.   Madison conferred a benefit on Defendants by performing valuable services that helped them obtain tens of millions of dollars of fee compensation.

128.   Defendants understood that Madison was entitled to a fair percentage of that fee compensation, proportionate to his contribution towards the overall result, yet have refused to pay it to him.

129.   Under the circumstances, retaining Madison's share of the fee compensation is unjust.

130.   Defendants' actions were accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of Madison's rights, and other circumstances tending to aggravate the injury.

## COUNT VI: Promissory Estoppel (in the alternative)

## (Against all Defendants)

131.   Plaintiffs incorporate the allegations set forth in the paragraphs above.

132.   If the other counts described above fail to redress Madison's injuries, Madison has a claim for promissory estoppel.

133.   Lankford, on his own behalf and on behalf of his firm, made a series of promises to Madison so as to induce Madison's reliance.

134.   Madison reasonably relied on those promises to his detriment.

135.   Defendants' actions were accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of Madison's rights, and other circumstances tending to aggravate the injury.

## REQUEST FOR RELIEF

Plaintiff demands judgment against Defendants as follows:

a.   Compensatory damages of at least $13.5 million, in an amount to be determined at trial;

b.   Punitive damages;

c.   An accounting from Lankford & Reed;

d.   Pre-judgment interest;

e.   Post-judgment interest;

f.   Attorney's fees and costs; and

g.   Any other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

 /s/ Timothy R. Clinton
Timothy R. Clinton (DC Bar 497901)
Gregory M. Lipper (DC Bar 494882)
CLINTON BROOK & PEED
1455 Pennsylvania Ave NW, Suite 400
Washington, DC  20004
tim@clintonbrook.com
glipper@clintonbrook.com
(202) 621-1828
Fax: (202) 204-6320

*Counsel for Plaintiff Al Madison*

May 31, 2018