```
 1                 IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3    Alan Madison, et al.,          ) Civil Action
                                     ) No. 18-cv-1282
 4                   Plaintiffs,     )
                                     ) STATUS CONFERENCE
 5    vs.                            )
                                     ) Washington, DC
 6    V. Thomas Lankford, et al.,    ) March 28, 2019
                                     ) Time:  2:00 p.m.
 7                   Defendant.      )
      _____
 8
                     TRANSCRIPT OF STATUS CONFERENCE
 9                           HELD BEFORE
                THE HONORABLE JUDGE AMY BERMAN JACKSON
10                    UNITED STATES DISTRICT JUDGE

11    _____

                           A P P E A R A N C E S
12

13    For Plaintiffs:      Timothy Ryan Clinton
                           CLINTON & PEED
14                         777 6th Street, NW
                           11th Floor
15                         Washington, DC 20001
                           (202) 621-1828
16                         Email: Tim@clintonpeed.com


17    For Defendants:      Michael W. Robinson
                           Kevin William Weigand
18                         VENABLE LLP
                           8010 Towers Crescent Drive
19                         Suite 300
                           Tysons Corner, VA 22182-2707
20                         (703) 760-1988
                           Email: Mwrobinson@venable.com
21                         Email: Kwweigand@venable.com
                           Dennis John Quinn
22                         CARR MALONEY, P.C.
                           2020 K Street, NW
23                         Suite 850
                           Washington, DC 20006
24                         (202) 310-5519
                           Email: Djq@carrmaloney.com

25
```

1    Court Reporter:          Janice E. Dickman, RMR, CRR
                              Official Court Reporter
2                             United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
3                             Washington, DC  20001
                              202-354-3267
4                                  *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURTROOM DEPUTY:  Your Honor, this afternoon we

 2     have civil action number 18-1282, Allen Madison, et al. versus

 3     V. Thomas Lankford, et al.

 4              Will counsel for the parties please approach the

 5     lectern, identify yourself for the record and the party or

 6     parties that you represent.

 7              MR. CLINTON:  Good afternoon, Your Honor.  Tim

 8     Clinton on behalf of plaintiffs.

 9              THE COURT:  Good afternoon.

10              MR. ROBINSON:  Good afternoon, Your Honor.  Michael

11     Robinson on behalf of the defendants Thomas Lankford and

12     Lankford & Reed.

13              THE COURT:  Good afternoon.

14              MR. QUINN:  Good afternoon, Your Honor.  Dennis

15     Quinn, also on behalf of the defendants.

16              MR. WEIGAND:  Good afternoon, Your Honor.  Kevin

17     Weigand, also on behalf of the defendants.

18              THE COURT:  All right.  Good afternoon.  I need to

19     take care of one matter before I can -- the reading glasses.

20              I have pending in front of me a motion to dismiss,

21     because at the end of the day, some of these counts are going

22     to move forward and the entire case is not going to be

23     dismissed.  I'm going to rule from the bench, as opposed to

24     issuing a written opinion in connection with the motion to

25     dismiss.
```

 1          Many people have sat through these lengthy

 2     recitations and then at the end said, so, is there going to be

 3     a written opinion?  And so I'm telling you now, the answer to

 4     that question is no.  You have two choices:  You can take good

 5     notes, you can order the transcript.  But what I'm about to do

 6     is rule.

 7          While we're waiting for the delivery of the reading

 8     glasses that will assist me in this exercise, I just wanted to

 9     ask, is counsel for the -- somewhat related Oldaker matter

10     present in the courtroom?

11          MR. ANDERSON:  Yes, Your Honor.

12          THE COURT:  Okay.  I don't expect you to do anything

13     today, but -- and you can be seated -- but I wanted to put

14     something on the record in connection with your case and advise

15     you of something that the parties in this case have been

16     advised of, but I don't think I've had a chance to tell you

17     yet.  But since you're here, I might as well, which is -- and

18     you may already know this -- that when I left the U.S.

19     Attorney's Office my moons ago, my first affiliation was with

20     the Venable law firm that is representing Mr. Lankford.

21          In connection with my work there in the mid- to late

22     '80s and early '90s, I had the occasion to work with

23     Mr. Robinson.  So he is a former colleague of mine.  At that

24     point and at any point since then, we didn't have any social

25     get-together-for-dinner kind of relationship.  And I then took

1     several years of leave from the firm, I practiced at another

2     firm for 11 years before I was appointed to the bench.  So I

3     don't regularly recuse myself from matters involving people I

4     knew from Venable unless they were close personal friends.  But

5     I like to have the lawyers involved in any matter aware of that

6     information.  So now you are aware of that information as well.

7             MR. ANDERSON:  Thank you.  I have no problem with

8     that.

9             THE COURT:  Okay.

10            All right.  On May 31st, 2018, Allen Madison and his

11    six-member public relations firm, Alan Madison, LLC, brought a

12    six-count complaint against attorney Thomas Lankford and his

13    law firm, Lankford & Reed, alleging, in Count 1, fraudulent

14    misrepresentation and omission; Count 2, breach of fiduciary

15    duty; and then, in the alternative, Count 3, breach of

16    implied-in-fact contract; Count 4, a quantum meruit count;

17    Count 5, unjust enrichment, and; 6, promissory estoppel.

18            The plaintiffs claim that Mr. Lankford, quote,

19    tricked Madison into devoting himself almost exclusively to

20    Lankford's clients on a pure contingency basis over several

21    years, and in the end paid him no more than 1 to 2 percent of

22    Madison's expected fee.  Madison now seeks compensatory damages

23    of at least $13.5 million, as well as punitive damages, an

24    accounting from Lankford & Reed, and attorneys' fees and costs.

25            Pending before the Court is defendant's motion to

1    dismiss the complaint, docket 11, which plaintiffs opposed in

2    docket 13.  For the reasons that follow I'm going to deny the

3    motion to dismiss Count 1, the fraud count, and Counts 4 and 5.

4    But I will grant the motion to dismiss Count 2, breach of

5    fiduciary duty; 3, breach of implied contract, and; 6,

6    promissory estoppel.

7            The factual background in this case is all taken from

8    the complaint, as is required at this stage of the proceedings.

9            Defendant Thomas Lankford is an attorney who

10   represented some of the Americans who were taken hostage from

11   the U.S. embassy in Tehran, Iran in 1979.  And basically all

12   the facts -- I'm taking this from the complaint -- that's

13   paragraph 1.

14           For several years Lankford sought compensation for

15   these victims in U.S. courts to no avail.  As part of securing

16   their release, the United States government had agreed that the

17   hostages would be barred from suing Iran for compensation for

18   their ordeal.  After the failed lawsuits, Lankford changed

19   strategies and sought to persuade Congress to enact legislation

20   that would compensate his clients.  That's paragraph 2.

21           According to the plaintiffs, Lankford then assembled

22   a team of professionals with experience in media, public

23   relations, and lobbying to achieve his legislative goals.  As

24   part of this effort, Lankford hired Cornerstone Government

25   Affairs, a lobbyist group.  And this group, in turn,

1    subcontracted with plaintiff Al Madison in early 2011 to

2    conduct some media work; complaint paragraphs 57 to 59.

3           Cornerstone hired Madison to assist them in placing

4    an op-ed authored by a former hostage.  For his services

5    Cornerstone paid Madison $10,000 on October 25th, 2011.  Still

6    paragraphs 57 to 59.

7           Paragraph 66 alleges that Madison was interested in

8    doing more work for the team.  So on January 31st, 2012, he

9    circulated a proposal to Cornerstone, as well as defendant

10   Lankford, on how, quote, to expand public attention on the

11   plight of the former hostages.

12          Paragraph 69.  In response to this email, Cornerstone

13   offered to pay Madison $500,000 for the lists of tasks

14   described in his proposal, contingent on their success in

15   getting the hostages compensation.  Also in paragraph 69 it's

16   alleged, quote, Madison expected to complete those tasks within

17   three to six months.  And a Cornerstone employee said that he

18   expected the hostages to succeed in their larger effort within

19   a year.

20          Although Madison was brought on to the team by

21   Cornerstone, he claims that, quote, it soon became clear that

22   Madison was a full-fledged member of the team, rather than

23   acting as a subcontractor to or under the direction or

24   authority of Cornerstone.  He acted as an independent

25   professional, advising Lankford and his team directly;

1    paragraph 71.

2            He also claims in that paragraph that his role,

3    quote, expanded, close quote, and that he was, quote,

4    implementing far more than the four specific strategies he had

5    described in his initial proposal.

6            Madison also told Lankford, according to paragraph

7    72, in several meetings, that Cornerstone was, quote, not as

8    active or successful in the effort as they had initially led

9    Madison to believe, close quote.

10           Paragraph 73, quote, given these changed

11   circumstances, plaintiffs allege that Lankford agreed to modify

12   Madison's compensation in early 2012.

13           In paragraph 73 and 74, plaintiffs say that between

14   early 2012 until 2015 Madison and Lankford discussed Madison's

15   compensation nearly a dozen times.  Plaintiffs allege, in

16   paragraph 74, in the first of these meetings Madison told

17   Lankford that if the endeavor was to succeed, Madison would

18   have to do far more work than had been proposed in the

19   moving-forward plan for which Madison had been promised half a

20   million dollars.

21           Plaintiffs add, quote, to induce Madison to do this

22   added work, Lankford agreed to pay Madison far more.

23   Specifically, that is, according to the plaintiffs, Lankford

24   agreed that, A., Madison would receive not a flat fee but,

25   rather, a percent of the gross fee provided to the team.  B.,

1     the precise percentage of Madison's compensation would be

2     determined based on the results of each member's contribution

3     towards the team's overall success and not based upon the

4     amount of time expended or on other considerations.  C.,

5     Madison's percentage of the fee would be fair.  And, D.,

6     Lankford, not Cornerstone, would evaluate the value of

7     Madison's contributions relative to the other team members.

8     That's paragraph 75.  This was never reduced to writing.

9            On numerous occasions Madison told Lankford that he

10    considered his public relations and media efforts to be worth

11    20 percent of the overall effort.  That's paragraph 76.  The

12    paragraph also alleges in response, Lankford assured Madison

13    that he would be compensated fairly and in proportion to his

14    contributions as determined in good faith by Lankford.

15           So even the complaint doesn't alleged that there was

16    even a meeting of the minds on the 20 percent.  And this does

17    not appear to have sparked Madison to have sought a written

18    agreement.

19           Although it's quite clear that Lankford declined to

20    commit to a specific percentage, Madison alleges that, quote,

21    in context he, Madison, understood that Lankford, quote, agreed

22    that 20 percent of the overall fee reflected fair compensation

23    for Madison, but that Lankford wanted to retain reasonable

24    discretion to determine precisely how much each team member had

25    contributed towards the overall success.  And Lankford

1    understood that Madison was working for Lankford's team based

2    on this understanding.  That's set out in paragraph 77.

3           This is not the kind of language that would give rise

4    to an inference that there was a contract to sue upon.

5           But Madison also alleges that Lankford told him

6    throughout 2012 and later years that, quote, nobody on the team

7    had an agreement, much less a written agreement, for a specific

8    fee or percentage of the fee, close quote.  It's paragraph 79.

9    That is a statement of fact.  Madison further alleges that

10   these assurances induced him to trust Lankford because it

11   demonstrated that other members of the team trusted him to

12   fairly distribute the money and had prevented him from

13   insisting on having a written agreement.

14          Unbeknownst to Madison, however, allegedly Lankford

15   did have an agreement with Cornerstone which provided that

16   Cornerstone would receive one-third of the gross fee and that

17   Cornerstone would pay any other governmental and media

18   professionals, including Madison, out of their share.  That's

19   paragraph 81.

20          Madison alleges in the complaint, at paragraphs 3,

21   32, and 96, that between 2012 and 2015 he devoted most of his

22   time to the effort and succeeded in raising public awareness

23   about the former hostages by generating over 100 stories and

24   op-eds across the country, and also by recruiting an effective

25   lobbyist to the team, among other things.

On December 18, 2015 Congress enacted the Justice for United States Victims of State Sponsored Terrorism Act. According to the plaintiffs, the Act provided Lankford's clients, the Iran hostage victims, collectively $270 million in compensation.  Paragraphs 22 and 23.  Plaintiff contends that although the 270 million would be distributed over time, Lankford and his team were entitled to 25 percent of that amount; nearly $70 million worth of fees.  Paragraph 4.

On March 23rd, 2016, Lankford had lunch with Madison and a lobbyist on the team.  During that meeting, Lankford allegedly said that he expected to keep 60 percent of the fees and that the rest would be split fairly among the various lobbying and public relations professionals on the team. That's paragraph 86.

But according to the plaintiffs, once the first tranche of money was released, Lankford changed his mind and attempted to keep 85 percent of the fees.  That's paragraph 88.

Lankford then hired an attorney, Venable's Ed Wilson, to recommend how to distribute the money among team members; paragraph 93.

Paragraph 95 alleges that on December 2017 this attorney offered to pay Madison $750,000, which was described as the contract amount he had with Cornerstone of half a million, plus 250,000 to reflect the value of additional work. And Cornerstone was supposed to make that payment over time.

1              As noted earlier, Madison was of the view that he was

2      going to get 20 percent of the overall fee amount, which would

3      be approximately $14 million.   That's paragraph 77.

4              So, the 750,000 that he was ultimately offered for

5      his work constitutes only 1 to 2 percent of the nearly

6      70 million in fees Lankford stands to receive; paragraph 96.

7              According to the compliant, had Lankford distributed

8      the fund in accordance to the relative contributions of each

9      team member as promised, plaintiffs allege that Madison and the

10     lobbyist he recruited would be entitled to, quote, the lion's

11     share, close quote, since they, quote, are most responsible for

12     the effort's success, close quote.   That modest statement in

13     paragraph 6 of the complaint seems to far exceed even the

14     20 percent, but plaintiff does at least insist that he's

15     entitled to the 20 percent.

16             So, what is the standard of review to be applied at

17     this stage?   Everyone knows what it is.   To survive a rule

18     12(b)(6) motion to dismiss, a complaint must contain sufficient

19     factual matter, accepted as true, to state a claim of relief

20     that is plausible on its face.   So I will be applying that

21     standard from *Ashcroft versus Iqbal*, 556 U.S. 662, which quotes

22     from *Bell Atlantic Corporation versus Twombly*, 550 U.S. 544.

23             In evaluating a motion to dismiss under Rule

24     12(b)(6), as everyone also knows, the Court must treat the

25     complainant's factual allegations as true and must grant

1   plaintiff the benefit of all inferences that can be derived

2   from the facts alleged.  Therefore, when considering a motion

3   to dismiss, the Court must construe a complaint liberally in

4   the plaintiff's favor, and I will do that.

5           However, a pleading must offer more than labels or

6   conclusions or just a formulaic recitation of the elements of a

7   cause of action.  And *Iqbal* says that, quoting *Twombly*.  And

8   threadbare recitals of the elements of a cause of action,

9   supported by mere conclusory statements, do not suffice.  So, I

10  don't need to accept inferences drawn by the plaintiff if those

11  inferences are unsupported by facts alleged in the complaint,

12  nor must I accept the plaintiffs' legal conclusions.  And

13  that's set out by the D.C. Circuit in *Kowal versus MCI*

14  *Communications Corp.*, 16 F.3d 1271, and also *Browning versus*

15  *Clinton*, 292 F.3d 235, out of the D.C. Circuit in 2002.

16          So I get to begin with the question of, well, what

17  law do I apply to these facts that I'm accepting on their face?

18  The plaintiffs reside in the District of Columbia and the

19  defendants reside in Virginia.  This is set out in the

20  complaint in paragraphs 9 through 12.  Because this is a

21  diversity case, I must first determine which state law to

22  apply.  In resolving this question I applied a conflict of law

23  analysis of the forum state, which is the District of Columbia,

24  according to *Klaxon versus Stentor Electrical Manufacturing*

25  *Company*, 313 U.S. 487 at 496.

1           Under the District of Columbia's rules, the Court

2      must first determine whether a true conflict even exists

3      between the laws of competing jurisdictions.  *GEICO versus*

4      *Fetisoff*, 958 F.2d 1137, D.C. Circuit 1992.  If no true

5      conflict exists, according to the *GEICO* case, the Court applies

6      the law of the District of Columbia by default.  Here the

7      parties agree that there are no substantive differences between

8      D.C. and Virginia law for Counts 1 through 5.  Therefore, I'll

9      apply D.C. law by default.

10          The only remaining issue relates to Count 6, the

11     promissory estoppel claim.  As defendants point out, D.C. law

12     recognizes circumstances in which promissory estoppel may be

13     pled as a cause of action, while Virginia stringently refuses

14     to accept promissory estoppel as a separate cause of action.

15     Since there is a conflict, I have to determine which

16     jurisdiction has the most significant relation to the dispute,

17     as the Court of Appeals in D.C. said in *Dominion Caisson*

18     *Corporation versus Clark*, 614 A.2d 529 and 531.

19          The Court applies a multifactor test that draws from

20     the Second Restatement of Conflict of Laws, and it's referred

21     to alternatively as either the governmental interest or the

22     more substantial interest test.  It's laid out in *Adolph Coors*

23     *Company versus Truck Insurance Exchange*, 960 A.2d 617, pages

24     620 to -21, from the Court of Appeals in 2008.  Also the *Eli*

25     *Lilly* case, 764 F.2d at 882.

1          These are the factors:  One, the place of

2     contracting.  Two, the place of negotiation of the contract.

3     Three, the place of performance.  Four, the location of the

4     subject matter of the contract.  Five, the residence and place

5     of business of the parties.  And, six, the principal location

6     of the insured risk.

7          Taken together, these factors favor the application

8     of D.C. law here.  Not only do the plaintiffs reside here, but

9     the work described in the complaint -- lobbying and public

10    relations work to enact legislation by Congress -- was centered

11    in the District of Columbia.  See the allegations in the

12    complaint in paragraphs 35, 39, and 46.  Accordingly, I will

13    apply D.C. law to the promissory estoppel count when I get

14    there.

15         Starting with Count 1, fraudulent and

16    misrepresentation and omission.  To state a fraud claim a

17    plaintiff must allege four elements.  One, a deliberate

18    misstatement of fact; two, made with the intent to deceive

19    another person; three, reasonably relied upon by the deceived

20    person; four, which reliance proximately and directly resulted

21    in damage to that person.  D.C. Circuit case, *Shear versus*

22    *National Rifle Association of America*, 606 F.2d 1251 at 1259.

23         Additionally, Federal Rule of Civil Procedure 9(b)

24    requires in alleging fraud a party must state the circumstances

25    constituting fraud with particularity.

1      Defendants have moved to dismiss the fraud claim on

2   several grounds, including that it lacks the necessary

3   specificity under Rule 9(b).  They contend that plaintiffs

4   failed to plead when and where the alleged misrepresentations

5   or omissions occurred.  But plaintiffs' complaint does specify

6   the time and place of the alleged misrepresentations and

7   omissions.  Specifically, plaintiffs allege that the first in

8   the series of meetings took place between Madison and Lankford

9   in early 2002 in which Lankford agreed to expand the scope of

10   Madison's role and pay him a gross fee based on his

11   contributions to the legislative effort.  That's in paragraph

12   74.

13      The complaint also states that Madison and Lankford

14   discussed compensation nearly a dozen times from early 2012

15   until the end of 2015.  And while not all of them are detailed

16   as to the date, the complaint does, for instance, in paragraphs

17   80 and 86, describe a March 23rd, 2016 meeting in which

18   Lankford allegedly said that he expected to keep approximately

19   60 percent and the rest will be split fairly.  These

20   allegations are particular enough to sustain the claim at this

21   stage.

22      Next, defendants argue that fraud requires an

23   intentional misstatement of a fact and plaintiffs failed to

24   plead facts to support an inference that Lankford had a then-

25   existing intent not to perform.  This is a fairly reasonable

1    argument, specifically since the complaint also alleges at one

2    point that Lankford, quote, changed his mind, close quote.

3           While I'm going to ultimately conclude that this

4    count can move forward for now, I can tell you that this is a

5    very serious problem for the plaintiff and the fraud count is

6    hanging by a thread.

7           Defendants contend that all of Madison's fraud

8    accusations are based on vague allegations regarding future

9    events.  And under D.C. law promises of future events or

10   representations about future events generally will not support

11   common law fraud unless the facts establish that a promise was

12   made with a then-existing intent not to perform it.  They make

13   that argument on their motion -- in their memorandum on page

14   13, citing *Bennett versus Kiggins*, 377 A.2d 57, in D.C. Court

15   of Appeals in 1977.

16          It's true that almost all the alleged false

17   representations are statements of future intent; they involve

18   rosy predictions or matters of opinion and not fact, such as, I

19   will treat you fairly.  And the complaint lacks explicit

20   allegations that he didn't mean it when he said it.  But I'm

21   required to construe the complaint in the light most favorable

22   to the plaintiff.  And although this language is generally

23   conclusory, plaintiff does allege, in paragraph 98, that

24   Lankford knowingly made false representations.  And there are

25   allegations within Count 1 that Lankford promised to pay

1    plaintiff a percentage of the gross fee and that he knew this

2    was false because it was inconsistent with the terms of an

3    alleged already-existing agreement with Cornerstone that he

4    failed to reveal.  And there are also allegations that

5    Lankford's representations -- made representations that he was

6    going to be governed by the D.C. rules of professional conduct,

7    which also may have been incorrect.

8            Also, under Rule 9(b), malice, intent, knowledge, and

9    other conditions of a person's mind may be alleged generally.

10   And in any event, with respect to at least some of the

11   allegations within the count, plaintiffs have made the

12   necessary specific allegations about statements of fact that

13   Lankford knew to be the false at the time, or had a

14   then-existing intent not to perform.

15           In particular, complaint paragraphs 79, 81, and 82

16   allege that Lankford told Madison that nobody on the team had

17   an agreement, much less a written agreement, for a specific

18   fee, when in fact Cornerstone did have an agreement from which

19   it was supposed to pay Madison.

20           So, I find that for now the fraud claim has to

21   survive.  Although I do find it cannot be based on an alleged

22   misrepresentation that plaintiff was intentionally misled to

23   believe that he would receive 20 percent, since plaintiff

24   specifically alleges that 20 percent was his assessment of his

25   value and Lankford was not only silent on the point, but he

1    affirmatively resisted setting any percentage.

2           Finally, defendants argue the damages in fraud

3    actions are limited to actual or out-of-pocket damages, so

4    plaintiffs' request for the 20 percent contingency fee is

5    unacceptable because it amounts to a benefit-of-the-bargain

6    damages and that's not a remedy available for a fraud claim.

7           This is an issue that I think is going to have to be

8    taken up at a later point in the proceedings, but I think

9    defendants are incorrect as a matter of law.  The case they

10   cite, *McQueen versus Woodstream Corporation*, 672 F.Supp.2d 84

11   at page 89, from this District in 2009, states that while,

12   quote, the out-of-pocket damages measure is the norm in

13   fraudulent misrepresentation cases, the D.C. Circuit and D.C.

14   Court of Appeals have deviated from that rule in rare

15   circumstances to effect justice.

16          Moreover, the D.C. Circuit and D.C. Court of Appeals

17   have taken a flexible approach when the case involves a

18   contract for personal services that has been induced by fraud,

19   as is alleged here.  See *Espaillat versus Berlitz School of*

20   *Languages of America, Inc.*, 383 F.2d 220 at 222, D.C. Circuit

21   1967, and *Ludwig and Robinson, PPLC, versus BiotechPharma, LLC*,

22   186 A.3d 105, D.C. 2018.

23          At this stage, to maintain a fraud claim plaintiffs

24   must allege that they suffered damages proximately and directly

25   caused by the fraudulent misrepresentation.  That's from *Shear*.

1     And the defendants don't challenge the count on these grounds.

2          For all these reasons then, the motion to dismiss

3     Count 1, the fraud count will be denied.  But that doesn't mean

4     that there's not an uphill battle and we're not going to have

5     to look at it very closely at the time of summary judgment.

6          Count 2, breach of fiduciary duty.  To state a claim

7     for breach of fiduciary duty plaintiffs must allege facts

8     sufficient to show:  One, the exist of a fiduciary

9     relationship; two, a breach of the duties associated with the

10    fiduciary relationship, and; three, injuries that were

11    proximately caused by the breach of fiduciary duties.  I'm

12    quoting *Jones versus D.C.*, 241 F.Supp.3d 81, at page 90, which

13    was quoting *Friends Christian High School versus Geneva*

14    *Financial Consultants*, 39 F.Supp. 3rd 58.

15         As a general rule, the mere existence of a contract

16    does not create a fiduciary duty.  *Paul versus Judicial Watch,*

17    *Inc.*, 543 F.Supp.2d 1, at 6, in this district in 2008, citing

18    *Steele versus Isikoff*, 130 F.Supp.2d 23, at 36.

19         Plaintiffs allege that defendants owe them a

20    fiduciary duty based on two theories.  First, they say the

21    parties entered into a traditional fiduciary relationship by

22    establishing a joint venture.  And, second, they say that a

23    special circumstance of trust between ordinary business people

24    gave rise to fiduciary duties.

25         The D.C. Court of Appeals has consistently held that

1    a right of joint control is ordinarily the key to finding the

2    existence of a joint venture.  *Washington Investment Partners*

3    *of Delaware, LLC, versus* -- I don't know what S-E-C stands for

4    here.  Sec; secretary?  Security -- *House, K.S.C.C.*, 28 A.3d

5    566, a 2011, quoting *Beckman versus Farmer*, 579 A.2d 618, D.C.

6    1990.  This right flows from each joint venturer's original

7    co-ownership of the enterprise.  Nowhere in the complaint do

8    plaintiffs mention the term "joint venture," nor do they assert

9    any facts that would give rise to the inference that both

10   parties entered into a joint venture, or that Madison exercised

11   much of any, much less joint, control.

12          Indeed, plaintiffs allege that Madison was reporting

13   to defendant Lankford and was acting as an independent

14   professional and a member of a team that was assembled by

15   Lankford.  That's in his own complaint at paragraphs 2, 70, and

16   71.  They also specifically acknowledge that it was Lankford,

17   not Madison who reserved the right to make decisions about team

18   members' compensation.  That's in paragraph 75 and 77.  Such

19   allegations are plainly contrary to a partnership where both

20   parties have an equal right of control.

21          Therefore, I find that plaintiffs fail to state a

22   breach of fiduciary claim based on the existence of a joint

23   venture.

24          Alternatively, plaintiffs advance a special

25   circumstances of trust theory.

1          A fiduciary duty may exist even when there is no

2     traditional fiduciary relationship.  District of Columbia law

3     has deliberately left the definition of fiduciary relationship

4     flexible, so that the relationship may change to fit new

5     circumstances in which a special relationship of trust may

6     properly be implied.  This appears, though, in our case, to be

7     a standard independent contractor relationship that doesn't

8     come close to what's described in these cases.

9          But the cases say that are *Church of Scientology*

10    *International versus Eli Lilly* again 848 F.Supp. 1018, and

11    *Teltschik*, T-E-L-T-S-C-H-I-K, *versus William & Jensen, PLLC*,

12    683 F.Supp.2d 33.

13         A fiduciary duty can arise in the context of a

14    contractual relationship, quote, where circumstances show that

15    the parties extended their relationship beyond the limits of

16    contractual obligations to a relationship founded upon trust

17    and confidence.  The *Paul* case said that at 543 F.Supp.2d at 6.

18         Plaintiffs allege, in Count 2, that Lankford fostered

19    Madison's trust, further establishing a fiduciary relationship

20    by socializing with Madison on a regular basis, attending

21    baseball games, dinners and lunches, and generally purporting

22    to be Madison's friend, by invoking his standing in the legal

23    community and ethical obligation as a lawyer, and by

24    misrepresenting to Madison that other members of the team

25    trusted him enough to forgo a written agreement about their

1    precise compensation.  That's paragraph 108.

2         Beyond this conclusory statement, plaintiffs plead no

3    additional facts to support a finding that Lankford and

4    Madison's relationship extended beyond the normal bounds of a

5    contractual relationship to form a special relationship or bond

6    founded upon trust and confidence.  Moreover, plaintiffs point

7    to no court decision where an employer or principal owed a

8    fiduciary duty to its employee or contractor or agent.

9         In support of their position, plaintiffs do cite two

10   cases, *Cyberex Corp. versus Abbarin*, California -- no, I'm

11   sorry -- 2014 -- I don't know what that stands for -- 2017

12   WL 6452616, at 4, D.C. Superior Court case from 2017, and

13   *Hammett versus Ruby Lee Minar, Inc.*, 53 F.2d 144, at 147, from

14   the D.C. Circuit.  But those cases involve real estate

15   transactions and they lay out facts in which the plaintiffs

16   relied on the advice and judgment of the defendants before they

17   entered into the transactions.

18        Here, Madison states -- alleges that he was working

19   on behalf of Lankford's team, not the other way around.  So

20   Madison, not the defendants, were doing the advising and

21   counseling and generally acting as an agent for the defendants.

22   And that's alleged in paragraphs 36, 70, 71, and 77.

23        I'm aware that the existence of a fiduciary

24   relationship is a fact-intensive question that involves an

25   inquiry into the nature of the relationship, the nature of the

1    promises made, the services or advice given, and the

2    expectations of a party and, therefore, dismissal tends to be

3    disfavored at this stage, according to the D.C. Circuit in

4    *Firestone versus Firestone*, 76 F.3d 1205.

5          But I find that plaintiffs' conclusory references to

6    baseball games, dinners and lunches is just insufficient to

7    support an inference that this relationship extended beyond the

8    limits of contractual obligations, to the extent there was ever

9    a contractual obligation between the parties to begin with.

10          Accordingly, I'm going dismiss -- grant the

11   defendant's motion to dismiss Count 2, but do so without

12   prejudice.

13          Count 3, breach of implied-in-fact contract.

14   According to *Jordan Keys and Jessamy, LLP versus St. Paul Fire*

15   *and Marine Insurance Company*, 870 A.2d 58, D.C. in 2005, and

16   *Vereen versus Clayborne*, 623 A.2d 1190 from 1993, an

17   implied-in-fact contract is a true contract containing all

18   necessary elements of a binding agreement.  It differs from

19   other contracts only in that it has not been committed to

20   writing or stated orally in express terms, but, rather, is

21   inferred from the conduct of the parties in the milieu in which

22   they dealt.

23          D.C. Court of Appeals in the *Jordan Keys* case

24   articulated the requirements for recovering under an

25   implied-in-fact contract as follows:  One, valuable services

1    were rendered; two, for the person sought to be charged; three,

2    which services were accepted by the persons sought to be

3    charged, used and enjoyed by him or her, and; four, under such

4    circumstances as reasonably notified the person sought to be

5    charged that the person rendering the services expected to be

6    paid by him or her.

7            Additionally, under the law of the District of

8    Columbia, for an enforceable contract to exist there must be

9    both, one, agreement as to all material terms and, two,

10   intention of the parties to be bound.  That's *Novecon Limited*

11   *versus Bulgarian-American Enterprise Fund*, 190 F.3d 566 at 564,

12   from the D.C. Circuit in 1999.

13           Although all of the contract terms need not be fixed

14   with complete and perfect certainty, reasonable definiteness in

15   the essential terms of a purported contract must, however, be a

16   precondition for its enforceability, for otherwise the Court

17   would have no adequate means of identifying the obligations

18   which it should enforce.  The D.C. Court said that in *Rosenthal*

19   *versus National Produce Company*, 573 A.2d 365 at 370.  See also

20   *Stovell versus James*, 810 F.Supp.2d 237.  The Court must be

21   able to determine the terms of an agreement before it can

22   enforce them.

23           Defendants move to dismiss the implied-in-fact

24   contract count on the grounds that the terms of the contract

25   are too indefinite.  Specifically, they contend that the price

 1    or compensation is a material term that was never agreed upon

 2    by the parties and that D.C. law requires all material terms to

 3    be agreed upon to form a contract.

 4           Plaintiffs respond with two arguments.  Under their

 5    preferred theory, they argue that the implied contract terms

 6    require Lankford to pay Madison 20 percent of any of the fees

 7    received by the Lankford team, and there's nothing indefinite

 8    about that figure.  Well, the figure is definite, but the

 9    obligation to pay it is another matter.

10           Plaintiffs contend that a jury could find that

11    20 percent was the binding price term based upon a theory that

12    Lankford's silence constituted acceptance of that figure.  In

13    support of this argument, plaintiffs cite to the Second

14    Restatement of Contracts, which outlines circumstances in which

15    silence can be deemed as acceptance.

16           I don't really need to address those circumstances,

17    since they're irrelevant because, according to the complaint,

18    Lankford was not silent.  The complaint indicates that he

19    affirmatively resisted any agreement on a particular

20    percentage; complaint paragraph 76.  Throughout discussions

21    Madison told Lankford that legislative success would require

22    substantial media pressure and that a successful media campaign

23    would be worth approximately 20 percent of the overall effort.

24    In response, Lankford assured Madison that he would be

25    compensated fairly and in proportion to his contributions as

1    determined in good faith by Lankford.

2          Paragraph 77, Lankford wanted to retain reasonable

3    discretion to determine precisely how much each team member had

4    contributed towards the overall success.  Since the complaint

5    alleges that Lankford reserved the right to decide what

6    compensation was fair and proportionate at the conclusion of

7    the lobbying effort, the Court rejects plaintiffs' theory that

8    the parties entered into a binding contract for a 20 percent

9    contingency fee.

10         Next, plaintiffs argue that if a jury doesn't accept

11   Madison's 20 percent theory, the Court can find that there is,

12   nonetheless, a Type II contract, characterized as a contract on

13   agreed major terms, while leaving open certain other terms to

14   be negotiated later.  They laid that out in their opposition on

15   page 24.

16         While plaintiffs acknowledge that enforcing such

17   agreements can be challenging because the parties have not

18   committed to their ultimate contractual obligation but, rather,

19   to the obligation to negotiate the open issues in good faith,

20   it contends that a jury could find that Lankford hadn't

21   negotiated in good faith and it could compel his performance.

22         Plaintiffs overlook the fact that specific

23   performance is appropriate where the legal remedy, usually

24   money damages, is deemed to be either inadequate or

25   impractical.  That is *Stanford Hotels Corporation versus*

1    *Potomac Creek Associates, L.P.*, 18 A.3d 725, D.C. 2011.  That's

2    certainly not the case here, where the dispute comes down to

3    money.

4            Therefore, I find that plaintiffs' Type II contract

5    theory is also untenable.  And for these reasons I'm going to

6    grant defendants' motion to dismiss the breach of an

7    implied-in-fact contract.  The absence of an agreement on key

8    terms here is the biggest problem in this case.

9            Count 4, quantum meruit, and Count 5, unjust

10   enrichment in the alternative.

11           As an alternative to the breach of contract claim,

12   plaintiffs seek equitable relief under two related theories,

13   quantum meruit on Count 4, unjust enrichment in Count 5, as set

14   out in paragraphs 121 to -30.

15           I've done a lot of talking this afternoon, and to the

16   extent this is a case in search of a theory, this is what the

17   case is all about.  And this is what would enable it to go

18   forward even if I dismissed all of the other counts.

19           Quantum meruit may refer to either an implied

20   contractual or a quasi-contractual duty requiring compensation

21   for services rendered.  *New Economic Capital, LLC versus New

22   Markets Capital Group*, 881 A.2d 1087, at 1095, in D.C. in 2005,

23   quoting *Fred Ezra Company versus Pedas*, P-E-D-A-S, 682 A.2d

24   173, at 176, from 1996.

25           Under D.C. law to state a claim for quantum meruit a

1    plaintiff must allege:  One, valuable services rendered by the

2    plaintiff; two, for the person from whom recovery is sought;

3    three, which services were accepted and enjoyed by that person,

4    and; four, under circumstances which reasonably notified the

5    person that the plaintiff, in performing such services,

6    expected to be paid.  It's basically the same as the prior

7    count, but the amount doesn't have to have been agreed upon.

8    And that's *Alemayehu v. Abere*, A-L-E-M-A-Y-E-H-U versus

9    A-B-E-R-E, 298 F.Supp.3d 157, quoting the D.C. case of

10   *Providence Hospital versus Dorsey*, 634 A.2d 1216, on page 1218,

11   in note 8.

12           Meanwhile, the elements of an unjust enrichment claim

13   are:  One, the plaintiff conferred a benefit on the defendant;

14   two, the defendant retained the benefit, and; three, under the

15   circumstances, the defendant's retention of the benefit is

16   unjust.  That's *Boyd versus Kilpatrick Townsend and Stockton*,

17   164 A.3d 72, at 78, quoting *Peart versus District of Columbia*

18   *Housing Authority*, 972 A.2d 810.

19           Defendants move to dismiss both of these counts on

20   the ground that Madison is only entitled to the reasonable

21   market value of the services he provided and, therefore, he's

22   precluded from seeking the 13.5 million, or 20 percent, of the

23   fees he alleges Lankford & Reed may potentially earn over the

24   years.

25           Plaintiffs agree with the defendants that the measure

1    of damages under these counts would be the reasonable market

2    value of Madison's services, and they point out that ultimately

3    this is a question of fact to be decided by a jury and not

4    grounds for dismissal.  I agree.  Because defendants don't

5    challenge any of the elements of these equitable claims, and

6    the question regarding the reasonable market value of

7    plaintiffs' services is a question of fact that can't be

8    resolved at this stage, I'm going to deny the motions to

9    dismiss Counts 4 and 5.

10           And I don't know yet if we determined that these are

11   actually jury claims or to be tried by a Court, since we're all

12   now talking about equity.  So we're going to have to figure

13   that out at some point.  I just raise the question, I haven't

14   looked into it in any great detail.

15           Count 6, promissory estoppel.  As I noted earlier,

16   I'm looking at D.C. law to apply to this claim.  Promissory

17   estoppel provides a party with a remedy to enforce a promise

18   where the formal elements of a contract -- requirements of a

19   contract have not been satisfied, and it also often serves as a

20   substitute for one of those formal requirements.  That's *Vila*

21   *versus Inter-American Investment Corp.*, 570 F.3d 274 at 279,

22   D.C. Circuit 2009.

23           To recover on a theory of promissory estoppel the

24   plaintiff must show:  One, evidence of a promise -- I think you

25   know where I'm headed here -- two, the promise must reasonably

1    induce reliance upon it, and; three, the promise must be relied

2    upon to the detriment of the promisee.  *Wallace v. Eckert,*

3    *Seamans, Cherin & Mellot, LLC*, 57 A.3d 943, from D.C. in 2012,

4    quoting *Simard versus Resolution Trust Corporation*, 639 A.2d

5    540.

6              Finally, the doctrine of promissory estoppel

7    specifically requires that courts not give reliance on a

8    promise, unless it's necessary to avoid injustice.  So here we

9    know that there are going to be several counts moving forward.

10             Although a promise need not be as specific and

11   definite as a contract, it must still be a promise with

12   definite terms on which the promisor would expect the promisee

13   to rely.  *In re:  U.S. Office Products Company Securities*

14   *Litigation*, 251 F.Supp.2d 77, 97, citing *Bender versus Design*

15   *Store*, 404 A.2d 194.

16             Defendants move to dismiss the promissory estoppel

17   claim on the grounds that the alleged promises are too vague

18   and indefinite.  And I agree with them.  The first problem is

19   that the complaint does not specifically identify the promises

20   plaintiffs relied on to their detriment.  Under the promissory

21   estoppel count, the complaint merely states:  Lankford, on his

22   own behalf and on behalf of his firm, made a series of promises

23   to Madison so as to induce Madison's reliance.  That's

24   paragraph 133 and that's somewhat conclusory.

25             Assuming plaintiffs are referring to the promise that

1    Lankford would pay Madison a fair fee based on his

2    contributions, the Court finds that this term is too vague and

3    indefinite to fall within promissory estoppel.

4           The D.C. Circuit has held that although for purposes

5    of promissory estoppel the promise need not be as specific and

6    definite as a contract, in the final analysis there must be a

7    promise and it must be more than merely a promise to bargain in

8    good faith.  That's the *Novecon, Limited* case that I cited

9    before, 190 F.3d 556, at 565.

10          Here, plaintiffs, at most, allege an expectation to

11   be paid 20 percent of the overall fees collected, in paragraph

12   76.  But Lankford affirmatively refused to be bound by that

13   figure.  Indeed, when Madison proposed a figure, Lankford said

14   that Madison would be compensated fairly in proportion to his

15   contributions as determined in good faith by Lankford.  That

16   vague and indefinite promise to compensate him fairly based on

17   his contributions as determined by Lankford himself is simply

18   the equivalent of a promise to bargain in good faith, which is

19   insufficient to sustain this claim.

20          Moreover, because Lankford refused to lock himself

21   into the 20 percent figure that Madison proposed, it was

22   unreasonable for Madison to rely upon it as if Lankford had

23   actually agreed to it.  Therefore, I'm going to dismiss the

24   final count.

25          So, if you're keeping score, I'm going to deny the

1    defendants' motions to dismiss Count 1, fraud, and Count 4,

2    quantum meruit, and Count 5, unjust enrichment, and the case

3    will move forward on those three counts.

4         I'm going to grant the motions to dismiss Count 2,

5    breach of fiduciary duty; 3, breach of implied contract, and;

6    6, promissory estoppel.

7         So that leads to the next obvious question, which is:

8    What do we do now?  And I don't expect you to tell me at this

9    minute.  I think you need to absorb everything you've just

10   heard, you need to consult with your clients.  While you're

11   doing that, I think plaintiff needs to think long and hard

12   about how this case is going to play out going forward, given

13   his failure to insist on any sort of written agreement for all

14   of that time and the gap between what he says his

15   understandings were and his expectations were and what he

16   acknowledges was actually said and done.

17        Meanwhile, defendant has the problem of the grossly

18   disproportionate distribution of the fees that were eventually

19   earned and the fact that if the allegations in the complaint

20   are true, the plaintiff did a lot of work.

21        It strikes me that trial and cross-examination, and

22   probably even the depositions, would be unpleasant for everyone

23   involved -- except the lawyers -- and the parties would have

24   reason to welcome a negotiated resolution, rather than endure

25   the types of questioning they're going to have sit through, and

1        risk the all-or-nothing outcome of a trial.

2               So, what I would like to propose is the parties get

3        back to me in two weeks -- though if you need more time, I'll

4        give you more time -- to let me know if you are in agreement

5        that this case would benefit from being submitted at this

6        point -- since I really think the parties do know what the

7        facts are -- to mediation.

8               I think this case would benefit from early mediation

9        and I think it would specifically benefit from our court's ADR

10       program, where I have just the utmost confidence in our circuit

11       mediator, Carolyn Lerner, and the deputy mediator.  But

12       obviously, the magistrate judges are also available, if that's

13       a strong preference.

14              If you are not agreed on -- that you think mediation

15       is ripe at this time, then in two weeks what I would be looking

16       for is the Rule 16.3 report with a proposed schedule for moving

17       forward.  And as I've said, if this is too much to do in that

18       period of time, I'm happy to hear from you.

19              I was curious whether counsel for plaintiff in the

20       parallel case was going to be here today.  I'm not going to ask

21       you anything, but given the similarity of the allegations, if

22       these parties decide that mediation is an appropriate

23       resolution, I think it would behoove everyone to think about

24       whether it should all go at the same time.  And that's

25       something that you can think about, even though I haven't dealt

1    with dispositive motions in the other case yet.

2              So, do people think that two weeks is enough time, or

3    would you like more time?  Either one of you can start.

4              Counsel for the plaintiff.

5              MR. ANDERSON:  Your Honor, we're not bound by the two

6    weeks?

7              THE COURT:  I'm not asking you to file anything.

8    You're not the party in front of me.  I'm just asking everyone

9    to think about the fact, and since you're here, suggesting to

10   you, too.  But I was going to say to counsel for the defendant

11   anyway, whether -- and I haven't lined your factual allegations

12   up word-for-word with these, but I think you -- there are

13   things I said today that are surely going to be applicable, at

14   least the law is going to be applicable to some of your counts.

15   And so, the reason you're here, I think, is because you thought

16   you might learn some lessons that would be applicable in your

17   case.

18             And so, if it turns out that this is a mediated

19   matter, that would be available to your client as well.  But,

20   no, you don't have to file anything in two weeks.

21             What about you?

22             MR. CLINTON:  On the issue of timing, Your Honor, as

23   a plaintiff, we're always open to mediation.  So I can say,

24   from our side, we would be open to mediation.  We have a -- my

25   firm, including myself, has an eight-week trial before Judge

1    Cooper, starting April 29th.  We've asked for an extra week.

2    So if it would be possible to have it before that trial starts,

3    we could carve out a day.  Otherwise --

4              THE COURT:  Have the mediation?

5              MR. CLINTON:  Yeah, if that's possible.

6              THE COURT:  I can't control when the mediation is

7    going to be, and given the schedule the magistrate judges are

8    running with and the mediators are running with, I find that

9    unlikely.  And if you're tied up for a period of time in

10   between, then they'll just work with your schedule.

11             But I'm still going to ask you to get back to me in

12   two weeks because if you're not agreed about mediation, then

13   there's other information that I require.  And also, I think

14   it's useful to think for yourselves and with each other about

15   your choices, whether you want to go to the court's mediation

16   program, whether you want to go to a magistrate judge.  I think

17   right now our magistrate judges are operating under an

18   unusually heavy criminal burden right now.  And so, they -- it

19   may take them longer to get to you and I think -- but, you

20   know, they all have about the same level of success at this

21   point.

22             All right.  Mr. Robinson, what's your point of view?

23             MR. CLINTON:  Your Honor, I just had one quick

24   question on clarification on Your Honor's ruling.  Your Honor

25   stated that Count 2 was without prejudice, but I didn't hear

1    whether Count 3 or Count 6 were dismissed with or without

2    prejudice.

3          THE COURT:  I think all of the counts are based upon

4    the sufficiency of the facts alleged in the complaint.  So, I

5    believe they're all without prejudice this point.  But, given

6    the specificity and the length of the complaint, I'm not sure

7    that spending a lot of time coming up with an amended complaint

8    so that we can do this again makes that much sense, since --

9    especially your last several complaints -- claims were all in

10   the alternative, and some of the alternative ones are moving

11   forward.

12         MR. CLINTON:  My only concern is although we spent a

13   lot of time preparing the complaint, sometimes in the course of

14   discovery you learn things that you didn't know that might

15   affect our ability to amend at that point.

16         THE COURT:  All right.  Well, I understand that.  But

17   again, if you're -- I can see how that would affect Count 2,

18   which I've already said is without prejudice.  And I'm fine to

19   have it be all without prejudice, but what would be the point

20   of bringing back, let's say, the promissory estoppel case when

21   it was in the alternative to Count 5 anyway?

22         MR. CLINTON:  My client may have a refreshed

23   recollection of specifically what happened in that conversation

24   that he didn't have before, which would go to credibility, of

25   course.  But we don't know how the facts could play out, and

1    so --

2              THE COURT:  Okay.  All right.  That's fine.  The

3    motion to dismiss is granted without prejudice with respect to

4    the counts that are dismissed.

5              MR. CLINTON:  Thank you.

6              THE COURT:  Mr. Robinson?

7              MR. ROBINSON:  Good afternoon, Your Honor.  I guess a

8    couple points.  On the timing, I think two weeks will be

9    sufficient.  But I'm going to ask the Court for three anyway

10   because I've got six depositions I'm taking over the next week

11   and I just don't -- I would like to give myself a little extra

12   time and I need to confer with my client.

13             However, I preface that by saying I think we're going

14   to be talking more about the Rule 16 issue right now than

15   mediation.  Not out of a sense of being obstinate, but because

16   I know the Court is dealing with a complaint and is accepting

17   the facts as alleged in the complaint as true for purposes of

18   the motion.

19             For purposes of addressing issues such as mediation,

20   there's a big issue as to whether the right party is in front

21   of the Court for purposes of mediation, because you heard

22   specific allegations about Cornerstone, if there was a specific

23   contract with Cornerstone, and yet -- a contract between the

24   plaintiff and Cornerstone.  There's no allegation as to whether

25   that money was ever paid or not.  Leaves kind of the question,

1        where is Cornerstone, if they weren't paid?

2               But, Cornerstone would have to be part of any

3        mediation effort.  And, in fact, it would not only have to be

4        part of it, but would really be the only party in it because

5        there is an agreement -- not the agreement that was referenced

6        or alleged in the complaint, but there is a subsequent

7        agreement between Lankford & Reed and Cornerstone, where

8        Cornerstone expressly acknowledged that they were solely

9        responsible for any claim by Mr. Madison, and there's a duty to

10       defend and indemnify here.

11              All of which says I'm not going to be able to walk

12       into a mediation room with my client and resolve this matter

13       without Cornerstone's participation.  And as I indicated, it

14       would require more.  And I just don't know where that will be.

15              THE COURT:  All right.  And I'm not -- I never force

16       anybody to go to mediation if they don't think it's a valuable

17       exercise.  But there's also no reason why -- are you planning

18       to bring them in as a party?

19              MR. ROBINSON:  I hate to say it's too early to tell,

20       but it's too early to tell.

21              THE COURT:  Okay.

22              MR. ROBINSON:  I can tell the Court that there is an

23       action pending in Alexandria Circuit Court between my clients

24       and Cornerstone over their obligations.  And it's in Alexandria

25       because there was a venue selection clause.  So there is

1   ongoing litigation there as well.

2          So I'm not trying to avoid the Court's question --

3          THE COURT:  What stage is that litigation at?

4          MR. ROBINSON:  We've argued a demur, we've argued a

5   summary judgment motion, and that will be tried in July.

6          THE COURT:  Has the summary judgment motion been

7   denied?

8          MR. ROBINSON:  I apologize.  The answer to that is

9   yes, it was denied, with some rulings made to help narrow the

10  issues.  I think the judge, just yesterday, said it was

11  essentially denied in part -- granted in part, denied in part.

12  Technically, yes, the summary judgment was denied; the matter

13  is set for trial.

14         THE COURT:  All right.  Well, and part of what the

15  parties can discuss in their -- when you talk to each other

16  over the next three weeks, is whether this case should await

17  the outcome of that, which wouldn't delay things much anyway

18  because it sounds like you're not going to be taking

19  depositions while you're in Judge Cooper's courtroom.

20         So, I think you have a lot to discuss.  And there's

21  no -- if you don't tell me two weeks from now or three weeks

22  from now, yes, we would like to mediate, but you decide two

23  months from now, you can always call chambers and let me know.

24  You don't have to wait until the next time I ask.

25         So, what is it?  It's March 28th.  So how about April

1    19th for just letting me know where we're headed?  That's two

2    weeks.

3              THE COURTROOM DEPUTY:  That's three.

4              THE COURT:  That's three weeks.  Just as a file -- a

5    joint submission, either saying yes, we would love to be

6    referred to someone for something, or here's our proposed

7    schedule for moving forward and the 16.3 report.  I may not

8    schedule a scheduling conference, since we've all been here and

9    talked to each other and talked about settlement, which is what

10   I often talk about in the scheduling conference.

11             I will tell you, if this case moves forward into

12   discovery, there will be rules about how to handle discovery

13   disputes set out in my scheduling order.  And basically I do

14   what all the other judges in this building do -- or many of

15   them do -- which is require a telephone call before people

16   start filing motions for protective order and motions to

17   compel.  Usually about 85 to 90 percent of discovery disputes I

18   can resolve on the phone.  If it's something about privilege or

19   something complicated, then I'll let you brief it.  And if it's

20   a motion for protective order to cover confidential materials,

21   things like that, all you have to do is submit a joint order

22   and I'll sign it.  That doesn't require a phone call.

23             So, all that will be spelled out in there.  So --

24             THE COURTROOM DEPUTY:  Do you want a mediation status

25   report and the Rule 16.3 report on April 19th?

1          THE COURT:  Yes, one or the other.  If you're saying

2     we would like to go to mediation before we do discovery, then

3     you don't have to go through the whole 16.3 report.  So I'm

4     looking for a submission from the parties telling me where you

5     would like to head.  And if it's you want to keep going, then I

6     need a schedule.

7          THE COURTROOM DEPUTY:  To deny this motion now, we

8     need an answer to the remainder of the complaint.  Same day?

9          THE COURT:  Mr. Haley is reminding me that I forgot

10    about the answer.  So you need to do that, too.  And ordinarily

11    that would be before, but I think -- can we do it all at the

12    same time, or do you want a month to do everything?

13         MR. ROBINSON:  If we could have 30 days.

14         THE COURT:  Let's do that.  So everything, your

15    answer, information about whether you want to go to mediation

16    or whether -- if not, your Rule 16 report will all be due on

17    April 26th.

18         All right.  Anything further I need to take up right

19    now on behalf of the plaintiffs?

20         MR. CLINTON:  Nothing, Your Honor, from us.

21         THE COURT:  Okay.  Anything further on behalf of

22    Mr. Lankford?

23         MR. ROBINSON:  Thank you, Your Honor.  No.

24         THE COURT:  All right, everybody.  Everybody have a

25    good weekend.  I guess it's not the weekend yet.

1           THE COURTROOM DEPUTY:  It's not.

2           THE COURT:  It's not.

3           MR. ROBINSON:  It's close.  It's been really a long

4      day.

5           THE COURT:  It's been a long day.

6                                *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5           I, JANICE DICKMAN, do hereby certify that the above

6    and foregoing constitutes a true and accurate transcript of my

7    stenograph notes and is a full, true and complete transcript of

8    the proceedings to the best of my ability.

9                         Dated this 1st day of April 2019.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR, CRC
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25